# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| YANIRA YESENIA OLDAKER, *et al.*, : | |
| : | |
| Petitioners-Plaintiffs, : | |
| : | |
| v. : | CASE NO.: 7:20-CV-00224 (WLS) |
| : | |
| TAE D. JOHNSON, *et al.*, : | |
| : | |
| Respondents-Defendants. : | |

## ORDER

Before the Court is Petitioners-Plaintiffs' "Emergency Motion for Temporary Restraining Order and Petition for Writs of Habeas Corpus Ad Testificandum" (the "Motion"). (Doc. 56.)

This case is a hybrid habeas/civil action brought by thirteen[1] women immigrants ("Petitioners") who were detained at Irwin County Detention Center ("ICDC") while awaiting deportation. Petitioners claim that, while detained, they were subjected to medical and other abuse—most notably, unnecessary and nonconsensual gynecological procedures by Respondent-Defendant Dr. Mahendra Amin that left some Petitioners unable to have a child. (Doc. 54 at 15–16, 22–25.) Petitioners further claim that, when they complained publicly about this and other abuse, ICDC staff retaliated against them and the Immigrations and Customs Enforcement Agency ("ICE") tried to prevent them from speaking publicly by hastily executing their deportations. (*Id.* at 26–33.) Petitioners seek (1) habeas relief, including release from detention and stays of removal, and (2) monetary, declaratory, and injunctive relief. (*Id.* at 156–58.)

Petitioners filed the pending Motion for Temporary Restraining Order (Doc. 56) simultaneously with their amended pleadings (Doc. 54). The Motion seeks immediate relief from all alleged retaliation. (*Id.*) ICE opposes the Motion. (Doc. 100.) Having carefully

---

[1] Petitioners should clarify or seek to amend, as necessary, if there are fourteen Petitioners as alleged. (Doc. 54 at 7.)

1

considered the pleadings, the evidence, the Parties' written and oral arguments, and the briefs of *amici curiae* (Docs. 130; 131; 137), the Court **DENIES** the Motion **AS MOOT**.[2]

## I.   PROCEDURAL HISTORY

This matter was first brought before the Court on November 9, 2020 when Petitioner Yanira Yesenia Oldaker filed a "Petition for Writ of Habeas Corpus and Declaratory and Injunctive Relief," asserting that Respondents had violated her First and Fifth Amendment rights as well as certain other statutory and regulatory rights enjoyed by witnesses in ongoing investigations. (Doc. 1.) Oldaker sought release pending adjudication, a declaration by the Court that Respondents had violated her rights, and an injunction stopping her removal "unless Respondents demonstrate that such action is untainted by unlawful First Amendment retaliation and discrimination." (*Id.*) She paid the $5 filing fee applicable to habeas corpus actions and named Respondents Thomas P. Giles[3] in his official capacity as the Field Office Director of the Atlanta Field Office for ICE, Chad Wolf in his official capacity as the Acting Secretary of Homeland Security for DHS, Kenneth Cuccinelli in his official capacity as Senior Official Performing the Duties of the Director of ICE, William Barr in his official capacity as Attorney General of the United States, and ICE, DHS, and the Department of Justice ("DOJ") as respondents (the "Federal Respondents"). (Docs. 1; 8.) Because Oldaker was scheduled for deportation the same morning her petition was filed, she simultaneously filed an emergency motion for a temporary restraining order ("TRO") seeking an injunction that Federal Respondents not remove her until she could participate in investigations into Dr. Amin. (Doc. 2.) The Court promptly set a hearing on Oldaker's TRO motion for November 13, 2020. However, the Parties then filed a "Consent Motion to Revise Scheduling Order," asking the Court to postpone the hearing and set deadlines for subsequent briefing. (Doc. 13.) The Court granted the motion. (Doc. 16.)

Over the next few days, Petitioners Ana Gabriela Adan-Cajigal and Keynin Jackelin Reyes Ramirez filed similar petitions for habeas corpus and emergency TRO motions. (*See* Docs. 20; 21; 34; 38.) The Court set hearings on these motions and, on November 18, 2020,

---

[2] This Emergency Motion (Doc. 56) supersedes earlier TRO motions filed by certain Petitioners individually. As such, the earlier TRO motions (Docs. 2; 20; 21; 34) are **DENIED WITHOUT PREJUDICE AS MOOT**.
[3] Giles was later succeeded by Tae D. Johnson, who replaces Giles as a Party in this case. (*See* Doc. 138.)

2

*sua sponte* consolidated Adan-Cajigal's and Reyes Ramirez's cases into this case. Adan-Cajigal and Reyes Ramirez then moved (with Federal Respondents' consent) to continue their hearings and set briefing schedules coinciding with Oldaker's hearing, and the Court granted those motions. (Docs. 27 & 28.)

On November 24, 2020, the Parties filed a "Consent Motion to Revise Scheduling Order" (the "Consent Motion"), signed by counsel for the Petitioners and the Federal Respondents. (Doc. 39.) In the Consent Motion, the Parties stipulated, among other things, that:

- ICE agrees to remove no Petitioners, or certain other identified detainees, until the Court hears and resolves Petitioners' Motions for TROs;
- Petitioners agree to file a Consolidated Petition for Writ of Habeas Corpus, and a Consolidated Motion for TRO, for all similarly situated detainees at ICDC by a certain deadline, and Respondents agree to timely respond;
- All agree to continue the TRO hearing until after the week of January 21, 2021; and
- While the Consent Motion remains in effect, the Parties will cooperate and confer in good faith to reach a settlement.

(*Id.* at 5–6.) The Court granted and signed the Consent Motion that same day and prepared an Order reflecting the same, intending to docket that Order the next morning.

However, before the Court could docket that Order, the Court received an email from Federal Respondents' counsel asking the Court to *not* grant the Consent Motion because "the highest levels of ICE" had not agreed to it. (*See* Doc. 45.) Federal Respondents' email notwithstanding and finding good cause to do so, the Court noted that it had already granted and signed the Consent Motion before it received the email, and accordingly proceeded to enter the Order reflecting the same. (Docs. 45; 46.) Aside from the briefing deadlines, which were later extended as a result of changes in the Federal Respondents' counsel, that Order granting the Consent Motion remains in effect. (*See* Doc. 61.)

On December 21, 2020, Petitioners filed a 160-page "Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages" (the "Consolidated Petition"). (Doc. 54.) The Consolidated Petition names thirteen Petitioners-Plaintiffs ("Petitioners") and adds numerous more Respondents-Defendants ("Respondents"), including Patrick Musante in his individual and official

capacities as Assistant Field Office Director ("AFOD") of the Atlanta ICE Field Office, Ana Rivera in her individual and official capacities as the Medical Director of the ICE Health Service Corps, ICDC, the Hospital Authority of Irwin County (the "Hospital"), and Dr. Mahendra Amin, among others. (*Id.* at 1–3.) The Complaint brings, in total, twenty-one claims for relief. The first is a habeas claim seeking Petitioners' release from ongoing unlawful detention. (*Id.* at 113.) The others are civil claims seeking monetary, declaratory, and injunctive relief from all Respondents. (*Id.* at 114–158.) Several claims are directed at ICE, including a *Bivens*[4] claim for selective and discriminatory removal in violation of the First Amendment (Second Claim), a *Bivens* claim for punitive conditions of confinement and deliberate indifference in violation of the Fifth Amendment (Fifth Claim), claims under the Administrative Procedures Act ("APA") for an agency's failure to follow its own rules (Ninth and Tenth Claims), and claims under 42 U.S.C. § 1985(2) for unlawfully conspiring to deter a witness from testifying or participating in a judicial proceeding. (*Id.*) The other civil claims are directed at ICDC, the Hospital, and their staff, including, among other things, claims for First Amendment retaliation, punitive conditions of confinement and deliberate indifference in violation of the Fourteenth Amendment, conspiracy to deter participation in judicial proceedings in violation of 42 U.S.C. § 1985(2), breach of contract, medical battery, medical malpractice, and intentional and negligent infliction of emotional distress. (*Id.*)

Petitioners simultaneously filed the instant "Emergency Motion for Temporary Restraining Order and Petition for Writs of Habeas Corpus Ad Testificandum" asking for an order "requiring Respondents-Defendants [] to immediately cease any and all forms of retaliation against Petitioners detained in the custody of ICE, including deportation, pending the resolution of this lawsuit." (Doc. 56 at 2.) Petitioners further seek "writs of habeas corpus *ad testificandum* compelling ICE to ensure the availability of detained Petitioners for any further proceedings, including trial, or in the alternative, to order the release of detained Petitioners during the pendency of this lawsuit." (*Id.*)

After receiving extensions, the federal Respondents filed a response brief on February 18, 2021. (Doc. 100.) These Respondents also moved to stay the case for 90 days, which the

---

[4] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

4

Court will address separately. (Doc. 105.) Petitioners filed a Reply to the Federal Respondents' response on March 4, 2021. (Doc. 117.) The Court also received three *amici curiae* briefs, in support of Petitioners' Motion, on March 9 and 15, 2021. (Docs. 130; 131; 137.)

On March 16, 2021, the Court held an in-person hearing on the Motion. (*See* Docs. 141; 142.) After the transcript of the hearing was filed (Doc. 143), Petitioners and Federal Respondents timely filed post-hearing supplemental briefs. (Docs. 144; 145.) On June 8, 2021, Federal Respondents filed a Notice of New Facts in Opposition to Petitioners' Motion (Doc. 148), to which Petitioners responded on Jun 10, 2021 (Doc. 149). On June 21, 2021, Federal Respondents filed a Corrected notice of New Facts in Opposition to Petitioners' Motion (Doc. 150). The Court has also since resolved Petitioners' Motions to Seal Various Documents related to the TRO Motion and to Proceed by Pseudonym (Docs. 55 & 59). (Doc. 152.)[5] Thus, Petitioners' Motion (Doc. 56) is ripe for review.

## II.  FACTUAL BACKGROUND

### A.  Petitioners' Facts and Evidence

Petitioners show that Petitioners Yanira Yesenia Oldaker, Tatyana Alekseyevna Solodkova, Luz Adriana Walker, Lourdes Terrazas Silas, Jane Doe #5, Jane Doe #6, Jane Doe #8, Jane Doe #15, Jane Doe #22, Jaromy Jazmin Floriano Navarro, Mbeti Victoria Ndonga, Keynin Jacquelin Reyes Ramirez, and Ana Gabriela Adan Cajigal are aliens who were detained at ICDC in 2020. (Doc. 54 at 8-10.) Some Petitioners had final orders of removal and were waiting to be deported, while others were (and still are) awaiting the completion of their removal proceedings.

While at ICDC, Petitioners witnessed and were subjected to medical neglect and abuse. Most notably, some Petitioners received medically unnecessary gynecological and other examinations and treatment without consent, including from Respondent Dr. Mahendra Amin. (*E.g.*, Docs. 56-9 at 3–5 ¶¶ 14–24; 56-11 at 4 ¶¶ 16–17; 59-4 at 19–21, 69, 130–31; 59-8 at 28–30, 95–99, 179–182.) At least some examinations and treatments were invasive and involved surgery under general anesthesia. (*E.g.*, Docs. 56-10 at 3 ¶ 14; 56-11 at 4, 19–20 ¶¶ 16–17, 23; 59-4 at 19–21, 68–69, 80–85, 179–182.) Many procedures left Petitioners in

---

[5] The Court has not revealed in this Order any sensitive information that it ordered to be sealed from the public.

5

extreme pain, and some Petitioners were made partially or completely sterile. (*E.g.*, Docs. 56-10 at 3 ¶ 14; 59-4 at 80–85, 179–182.) Overall, the living and medical conditions at ICDC were extremely poor such that Petitioners often lacked access to basic provisions and safety, necessary medicine, treatment, and other medical attention. (*E.g.*, Docs. 56-9 at 6–10, 20–21 ¶¶ 26–47, 93; 56-10 at 1, 4, 8–10 ¶¶ 5, 15, 3–6, 8, 16; 56-11 at 8–11, 14–17, ¶¶ 37–47, 4–15; 59-4 at 7–9.) When treatment was provided, it was often inadequate, performed in unsanitary conditions, and lacking in protection against COVID-19. (*E.g.*, Docs. 56-9 at 6–8, ¶¶ 29, 33–34; 56-10 at 8–10 ¶¶ 3–6, 8, 16; 56-11 at 21, ¶¶ 26–27.)

On September 14, 2020, Dawn Wooten, a nurse who worked at ICDC, publicly reported the abuse in a whistleblower complaint and declaration sent to the Department of Homeland Security ("DHS"), ICE, and ICDC. (Doc. 34-12.) In reaction to that complaint, federal agencies, members of Congress, and a nongovernmental organization investigated. (Docs. 56-3; 56-4; 56-9 at 13, ¶ 61; 59-4 at 12, 182.) As investigators contacted and visited ICDC, Petitioners and other detainees spoke about their experiences and contacted lawyers, the press, and friends and family members to speak about their experiences. (*E.g.*, Docs. 56-9 at 17 ¶ 78; 56-10 at 1–2, 4 ¶¶ 6–8, 17–18, 56-11 at 14, 19 ¶¶ 1, 21–23.)

Immediately thereafter, ICDC staff began depriving Petitioners of food and water, placing Petitioners on suicide watch or in solitary confinement, verbally threatening Petitioners, physically abusing them, restricting access to phones, computers, and records, and confining them to cells where they could not talk to investigators. (*E.g.*, Docs. 56-9 at 13–14, 21 ¶¶ 61, 65, 94–95; 56-10 at 5–6 ¶¶ 20–25; 59-4 at 12–13, 182–87.)

Further, ICE deported and began deporting numerous Petitioners and other detainees who were speaking publicly and had final orders of removal. Petitioner Navarro, after being detained for eleven months, was deported on September 16, 2020, within a day after she told ICDC staff that she had spoken out against Dr. Amin with whom she had refused to have a hysterectomy (Doc. 56-11 at 1, 6–7 ¶¶ 2, 27–28, 30). Petitioner Ndonga, after being detained for eighteen-and-a-half months, was informed on October 27, 2020— the same day that she had her first interview with federal investigators about Dr. Amin— that she would be deported soon. (Doc. 56-10 at 1, 4 ¶¶ 3, 18–19). Petitioner Walker, who had been detained at ICDC since late 2018, was identified as a witness to federal investigators in late November 2020

6

concerning Dr. Amin's misconduct, and on December 3, 2020, she was fingerprinted and informed that her travel documents were being expedited for her deportation. (Doc. 54 at 44-48). And Petitioner Oldaker, after being detained for eleven months, was scheduled to be deported on November 9, 2020, just four days after her lawyers identified her to federal investigators as a witness to the misconduct at ICDC. (Doc. 54 at 33-40). ICE similarly began the process of deporting other non-Petitioner detainees such as Jane Doe #31 and Doreen Alexander, both of whom began being processed for deportation hours after they spoke to investigators (Docs. 59-6 at 13–14 ¶¶ 53–59; 56-11 at 1, 6–7 ¶¶ 2, 27–28).

### B. Respondents' Facts and Evidence

In opposition to Petitioners' Motion, the federal Respondents have submitted sworn declarations by Respondent Patrick Musante, an AFOD for the ICE Enforcement and Removal Operations Atlanta field office ("ERO Atlanta").[6] (Doc. 100-1 ¶ 1.) Musante offers his declarations based on "personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, employees of DHS contract facilities, and information portals maintained and relied upon by DHS in the regular course of business." (*Id.* ¶ 2.) According to Musante, ERO Atlanta lacked any knowledge of allegations concerning Dr. Amin and conditions at ICDC until Wooten filed the whistleblower complaint on September 14, 2020. (*Id.* ¶ 8.) As a result of the investigation, on September 24, 2020, ERO Atlanta began notifying the DHS Office of Professional Responsibility ("OPR") when any female detainees at ICDC were scheduled for removal. (*Id.*) For some time, ERO Atlanta did not know the names of particular detainees who had spoken out, and thus was unable to make decisions about deportation on retaliatory bases. *Id.* On October 2, 2020, OPR narrowed the notification requirement to thirty-one specific detainees, and from then on, ERO Atlanta would delay any detainee's removal if OPR requested additional time to interview that detainee. (*Id.*)

The federal Respondents generally deny that they deported or attempted to deport any Petitioner to silence or retaliate against her. ICE rejoins that Petitioners' suggestions of

---

[6] The opponents to the TRO Motion are the federal Respondents sued in their official capacity only. Dr. Amin has also specified that he takes no position on the Motion as the relief sought applies only to the federal Respondents. (*See* Doc. 77.)

7

accelerated removals are "unrealistic." (Docs. 100-1 ¶ 4; 145 at 6.) That is because the nature and length of the process for executing removals is case-specific and depends on various factors, including the country of removal, the existence of travel documents, and travel logistics. (Doc. 100-1 ¶ 4.) Typically, once a noncitizen is subject to a final order of removal, ERO Atlanta begins to effectuate removal. (Doc. 145-1 at ¶ 4.) In Musante's experience, "removals are not generally effectuated in less than 48 hours from arrest" (Doc. 100-1 ¶ 4), and the removal process can take weeks or months. (Doc. 145-1 at ¶ 4.) First, the managing case officer must receive notification that a final administrative order of removal has been issued. (*Id.*) Next, the case is transferred to an ERO officer who prepares the case for removal, which sometimes involves obtaining travel documents or country clearance. (*Id.*) Upon receiving those things, the ERO officer schedules the alien for physical removal on a commercial aircraft or charter flight. (*Id.*) In Atlanta, all removals must be conducted via airplane. (*Id.*) Removals from Atlanta might occur weekly, monthly, or more sporadically depending on the country of removal, whether an escort is needed, and the route of travel. (*Id.*) On the day before a removal, ERO conducts records checks to confirm that there are no impediments to removal. (*Id.*)

The federal Respondents specifically deny that Petitioner Navarro was deported for retaliatory reasons. Rather, Musante asserts that she was deported in the normal course of agency business on September 16, 2020, before ERO Atlanta learned of the complaints at ICDC and before the practice of notifying OPR was adopted. (Doc. 100-1 ¶¶ 5, 8.) Planning for Navarro's removal began between August 27, 2020 and September 8, 2020. (*Id.*) On September 10, 2020, Navarro was scheduled for her September 16, 2020 flight departing the United States, which is approximately four days before ERO Atlanta became aware of allegations against Dr. Amin and five days before ICDC staff learned that Navarro had spoken publicly. (*Id.*)

Musante further asserts that before September 2020, "each of the Petitioners were either in removal proceedings (Jane Doe #8, Jane Doe #22, Jane Doe #6, Jane Doe #15, Oldaker), pending appeal of an order of removal (Adan, Jane Doe #5, Reyes-Ramirez, Walker), or had final orders of removal (Ndonga, Solodkova, Terrazas-Silas)." (Doc. 100-1 ¶ 6.) Furthermore, although most Petitioners were in ICE custody when this case was filed, no

8

Petitioners are in custody anymore. With the exception of Petitioner Navarro who was deported, the Petitioners have been released from custody either on their own recognizance or under orders of supervision as a result of an injunction entered in a separate case. (Docs. 100-1 ¶ 5.) In that case, a district court judge entered a preliminary injunction requiring ICE to evaluate each alien being detained in an ICE facility and determine whether ICE should continue detaining the alien given the dangers presented by the COVID-19 pandemic in the Central District of California. *Fraihat v. United States Immigration and Customs Enforcement*, 445 F. Supp. 3d 709, 750-51 (C.D. Cal. 2020); *see also Fraihat v. United States Immigration and Customs Enforcement*, 2020 WL 6541994, at *12–13 (C.D. Cali. Oct. 7, 2020) (granting in part and denying in part the plaintiffs' motion to enforce the preliminary injunction and clarifying certain parts of the preliminary injunction). The injunction required ICE to release an alien if certain health or other circumstances exist for that alien. *See Fraihat*, 445 F. Supp. 3d at 750–51. Pursuant to that injunction, ICE individually reviewed each Petitioner in this case (other than Navarro, who was already deported) and released each of those Petitioners subject to certain conditions. (Doc. 100-1 ¶ 5.) No Petitioner currently remains at ICDC. Musante asserts that ICDC stopped accepting new female detainees in December 2020, and that no females have been detained at ICDC since April 22, 2021. (Docs. 148-1 & 150 ¶ 1.) Further, ICE has been instructed to discontinue the use of ICDC as soon as possible. (Docs. 148-1.)

In Musante's declaration filed after the hearing on the Motion, he asserts that ICE granted discretionary administrative stays of removal to Petitioners Reyes Ramirez and Adan Cajigal pending the outcome of this Motion. (Doc. 145-1 ¶ 6(a)-(b)). He also asserts that on March 31, 2021, the same day the declaration was filed, ICE granted administrative stays of removal to certain Petitioners who have final orders of removal—this means that ICE has formally agreed to refrain from executing removal of these Petitioners while the stay remains in effect. On November 17 and 18, 2020, ICE granted discretionary administrative stays of removal to Petitioners Reyes Ramirez and Adan Cajigal pending the outcome of this Motion. (Doc. 145-1 at ¶ 6.a.–b.) On March 31, 2021, ICE granted discretionary six-month-long administrative stays of removal to Petitioners Oldaker, Luz Walker, Mbeti Ndonga, Lourdes Terrazas-Silas, and Tatiana Solodkova based on those Petitioners' properly filed requests for administrative stays of removal, form I-246. (Doc. 145-1 ¶ 6c; Doc. 100-1 ¶ 9.); *see also* 8 C.F.R.

9

§ 241.6 (Administrative Stay of Removal). These six-month stays will presumably expire sometime around September 30, 2021. However, Musante asserts that I-246s were rejected as improperly filed on behalf of Petitioners Jane Doe #15, Jane Doe #5, Jane Doe #6, and Jane Doe #22,. (Doc. 145-1 ¶ 8.) Of those, Jane Doe #15 since properly filed an I-246 that was granted on June 15, 2021, and Jane Doe #8 submitted a recent I-246 to a Miami ERO office that was denied on that grounds that she is not "an enforcement priority under the current enforcement priority guidance, and thus not presently at risk of removal." (Doc. 150 ¶¶ 3-4.) As of March 31, 2021, Petitioner Jane Doe #22's removal proceedings were still pending with the Board of Immigration Appeals, so she was not eligible for a discretionary stay of removal. *Id.* ¶ 9. Musante also asserts that "ICE has no plans to bring any of the Petitioners back into ICE custody." (Doc. 100-1 ¶ 7.)

### III.   DISCUSSION

With that background established, the Court proceeds to consider Petitioners' Motion (Doc. 56). The Motion asks the Court to:

(1) issue a writ of habeas corpus *ad testificandum* "compelling ICE to ensure the availability of detained Petitioners for any further proceedings, including trial, or in the alternative, to order the release of detained Petitioners during the pendency of this lawsuit" (Doc. 56 at 2);

(2) require Federal Respondents "to immediately cease any and all forms of retaliation against Petitioners detained in the custody of ICE," including "use of force, solitary confinement, [and] denial of privileges" "pending the resolution of this lawsuit" (Doc. 56 at 2; 56-1 at 32); and

(3) require Federal Respondents to immediately cease retaliatory deportations of Petitioners "pending resolution of this lawsuit" (Doc. 56 at 2; 56-1 at 32).

The Respondents argue that the Motion should be denied for several reasons. (Doc. 100.) First, they argue that it is moot because Petitioners have been released from custody and this Court can no longer grant meaningful relief. (*Id.* at 6–8.) Second, insofar as Petitioners seek stays of removal, this Court lacks subject-matter jurisdiction. (*Id.* at 8–10.) Third, Petitioners have not satisfied the elements for a TRO and preliminary injunction. (*Id.* at 10–19.)

### A. Mootness

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Al Najjar*, 273 F.3d at 1335–36 (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "Put another way, 'a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.'" *Florida Ass'n of Rehab. Facilities, Inc. v. Florida Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1216–17 (11th Cir. 2000) (quoting *Ethredge v. Hail*, 996 F.2d 1173, 1175 (11th Cir. 1993)). "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Al Najjar*, 273 F.3d at 1336. "[M]ootness is jurisdictional, and the court must resolve any question of mootness before it assumes jurisdiction." *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008) (addressing mootness before addressing subject matter jurisdiction).

Even where an issue is moot, a court may still consider it where "the action being challenged . . . is capable of being repeated and evading review." *Id.* (emphasis removed). This is a "narrow" exception that applies only in "exceptional situations." *Id.* (quoting *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1256 (11th Cir. 2001) and *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). This exception applies when "(1) there [is] a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *Sierra Club v. Martin*, 110 F.3d 1551, 1554 (11th Cir. 1997). "The remote possibility that an event might recur is not enough to overcome mootness, and even a likely recurrence is insufficient if there would be ample opportunity for review at that time." *Al Najjar*, 273 F.3d at 1336.

The Respondents argue that the Motion is moot because Petitioners have been released from detention, such that the Court can no longer grant meaningful relief. (Doc. 100 at 6–8.) Second, they argue that the alleged harm is not capable of repetition yet evading review because "Petitioners are not at imment risk of being re-detained[,]" and even if they were re-detained, "Petitioners would have time to seek emergency relief." *Id.* at 7-8. Considering the law and the facts of this case, the Court agrees.

11

"If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (explaining that mootness is jurisdictional because federal courts can only resolve "live" cases and controversies). Thus, "[t]he general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief" even when "there is no assurance that he will not be returned to the jail." *McKinnon v. Talladega Cty., Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984). The same rule has been applied to alien detainees, even where they have asserted that they could be re-detained. *See, e.g., Najjar*, 273 F.3d at 1341 (dismissing alien detainee's appeal as moot); *Olusegun Okakekan Akinruntan v. Holder*, No. 4:13-cv-0010-JHH-JEO, 2013 U.S. Dist. LEXIS 161721, at *17 (N.D. Ala. Sep. 30, 2013) ("[A]n alien's release from extended detention by ICE under an order of supervision generally renders moot a § 2241 habeas challenge to the legality of his prior detention."); *Vitkus v. Holder*, No. 2:13-cv-116-FtM-29CM, 2015 U.S. Dist. LEXIS 85759, at *4 (M.D. Fla. July 1, 2015) ("Where a habeas petitioner protesting his detention is no longer in custody, the dispute with regard to his detention is mooted."); *Tairou v. Gartland*, No. 5:19-cv-44, 2019 U.S. Dist. LEXIS 224257, at *6 (S.D. Ga. Dec. 9, 2019) ("Because [petitioner] has been released from custody and has not shown more than a 'remote possibility' he will be detained again, he has not overcome mootness.").

In fact, Petitioners have conceded that their request for release from detention is moot: "Plaintiffs have obtained the alternative relief they sought by being released and so withdraw their petition for emergency writs of habeas corpus *ad testificandum*. However, Plaintiffs reserve the right to file such petitions at a future date in the event they are re-detained." (Doc. 117 at 6 n.1.) However, Petitioners argue that "the threat of retaliatory deportation looms over Petitioners even after their release from custody" and that "[a]n order enjoining such deportation would therefore offer 'meaningful relief[.]'" (Doc. 144 at 5.) They further argue that various exceptions to the mootness doctrine apply, including that an detainee released under an order of supervision is still "in custody" and that a threat of retaliation remains imminent. *Id.* at 6. The Court will address each of the exceptions raised by Petitioners in turn.

12

First, a habeas petition is rendered moot upon the petitioner's release unless the petitioner is challenging (a) the conditions of release or (b) the validity of the conviction or detention, such that a "collateral consequence" of the invalid detention still exists after the petitioner is released on supervised release. *Alvarez v. Holder*, 454 F. App'x 769, 772 (11th Cir. 2011) (rejecting "the government's argument that the district court lacked jurisdiction to hear the constitutional arguments related to [petitioner's] conditions of release") (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) and *Dawson v. Scott*, 50 F.3d 884, 886 n.2 (11th Cir. 1995)). Neither is being challenged here. Petitioners do not contest their detainability, removability, or the conditions of their release. Rather, they challenge the retaliatory conditions of confinement at ICDC and their attempted deportations by ICE and state that:

> [T]his Court should order Respondents to cease any form of retaliation against detained Petitioners, including deportation, pending the resolution of this lawsuit; and issue writs of habeas corpus *ad testificandum* compelling ICE to ensure the availability of detained Petitioners for any further proceedings, including trial, or in the alternative, order the release of detained Petitioners during the pendency of this lawsuit.

(Doc. 56-1 at 32.) Because no Petitioners are "detained," the Motion appears moot on its face.

Moreover, "[p]ast exposure to illegal conduct does not constitute a present case or controversy involving injunctive relief if unaccompanied by any continuing, present adverse effects." *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985). A plaintiff seeking injunctive or declaratory relief must show "a 'real and immediate threat' of future injury . . . . [H]e must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Koziara v. City of Casselberry,* 392 F.3d 1302, 1305 (11th Cir. 2004) (citation omitted). Thus, where illegal conduct has ended, the claim for injunctive relief is moot unless there is "a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Sierra Club*, 110 F.3d at 1554; *Al Najjar*, 273 F.3d at 1336 ("[A] remote possibility that an event might recur is not enough to overcome mootness.").

Ten months have now passed since this case was brought and the first Emergency Motion for TRO was filed by Petitioner Oldaker. All Petitioners were released from custody several months ago due to an injunction entered in a separate case, and, in addition, all of the

13

Petitioners who properly requested an administrative stay of removal from ICE were granted such a stay, except one who was deemed a low priority for removal in the Miami office. Respondents have filed a sworn declaration affirming that a detainee released from ICE custody may be redetained if "new evidence indicates they are a danger or flight risk, if they fail to comply with the terms of their release, such as failing to report as scheduled or if they are scheduled for removal." (Doc. 100-1 ¶ 7.) Even after two Petitioners failed to report post-release, "ICE ha[d] no plans to bring any of the Petitioners back into ICE custody." *Id.* To-date, there is no evidence providing a reasonable expectation that Petitioners are under a real and immediate threat of redetention or deportation.

Even if the Court could find that Petitioners remain under a real and immediate threat of retaliatory deportation, the exception to mootness only applies where "the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *Sierra Club*, 110 F.3d at 1554; *Al Najjar*, 273 F.3d at 1336 ("[E]ven a likely recurrence is insufficient if there would be ample opportunity for review at that time.") Here, the record amply demonstrates that if ICE were to redetain a Petitioner for deportation, Petitioners' counsel could promptly move the Court at that time for an injunction. Counsel has done so numerous times in this case and also simultaneously filed Petitions for Writ of Habeas Corpus in new civil actions, and the Court promptly set the motions for a hearing. It is, thus, clear that Petitioners' counsel could easily file a motion for a TRO in this pending case. *See, e.g.*, *Najjar v. Ashcroft*, 273 F.3d 1330, 1340 (11th Cir. 2001) ("The narrow exception for actions that are capable of repetition yet evading review applies only in the exceptional circumstance in which the same controversy will recur and there will be inadequate time to litigate it prior to its cessation. . . . [S]hould any review somehow become necessary, there is no reason to believe that there will be either inadequate time or an inadequate forum in which to litigate the issue."); *Brazier v. Dep't of Homeland Sec.*, Civil Action No. 7:14-CV-58 (HL), 2014 U.S. Dist. LEXIS 111016, at *1 (M.D. Ga. Aug. 12, 2014) (denying petitioner's motion to stay deportation as moot where he had been released on bond).

Petitioners further argue that the "voluntary cessation" exception to mootness applies and that "Defendants have not met the 'formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" (Doc. 117

14

at 7) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, Inc., 528 U.S. 167, 189 (2000)). However, that is not the standard that applies to government actors. The law is well-established that "government actors receive the benefit of a rebuttable presumption that the offending behavior will not recur[;]" whereas "private citizens are not entitled to this legal presumption." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007) (citing *Troiano*, 382 F.3d at 1283) (explaining that courts are "more apt to trust public officials than private defendants to desist from future violations"). "Hence, 'the Supreme Court has held almost uniformly that voluntary cessation [by a government defendant] moots the claim.'" *Jacksonville Prop. Rights Ass'n v. City of Jacksonville*, 635 F.3d 1266, 1274 (11th Cir. 2011) (quoting *Beta Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 917 (11th Cir. 2009)). Indeed, to obtain an injunction, the plaintiff must first "establish by a preponderance of the evidence that this form of equitable relief is necessary." *Sheely*, 505 F.3d at 1182 n.10.

The presumption that a government's violation will not recur is rebuttable where the termination of the conduct: is ambiguous, appears to be an attempt to manipulate the court's jurisdiction, or has been inconsistent. *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents*, 633 F.3d 1297, 1310 (11th Cir. 2011). The presumption is typically rebutted where the government terminated the offending conduct in a "clandestine or irregular manner," such that there was "'a substantial possibility that the defendant has changed course simply to deprive the court of jurisdiction.'" *Id.* (quoting *Harrell*, 608 F.3d at 1267). Otherwise, "an assertion of mootness will be rejected '*only* when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated.'" *Beta Upsilon Chi Upsilon Chptr. v. Machen*, 586 F.3d 908, 917 (11th Cir. 2009) (citation omitted); *see City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982) (finding a challenge to a city statute was not moot where the city had announced its intention to reenact the offending statute if the Court dismissed the case). Here, Respondents have explained the basis of their process for scheduling the deportations of the Petitioners in the past,[7] have long-since released all Petitioners, have stayed the deportions of Petitioners who properly requested a stay (to the Atlanta office), have stopped detaining females at ICDC,

---

[7] The Federal Respondents argued that they did not know about the allegations at the time. The relevant agency decision-makers are now clearly aware of Petitioners' allegations, including the allegations of retaliatory deportation.

15

and Musante has sworn that ICE has no present intentions to redetain any of the Petitioners. (Doc. 100-1.) Furthermore, the case is not being dismissed at this time, such that any future misconduct by ICE can easily be brought before the Court for review.[8] Thus, the Court cannot find that there is a substantial likelihood that the offending conduct will recur if the Petitioners' Motion for a TRO is denied.

Having concluded that the Motion for TRO is moot, the Court cannot further address the constitutional and other arguments raised therein at this time. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) ("Any decision on the merits of a moot case or issue would be an impermissible advisory opinion.").

## CONCLUSION

Because the Court cannot grant any meaningful relief, Petitioners' "Emergency Motion for Temporary Restraining Order" (Doc. 56) is **DENIED AS MOOT WITHOUT PREJUDICE**.

**SO ORDERED**, this 17th day of September 2021.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[8] Respondents have not moved to dismiss this case but have instead asked that these proceedings be stayed for other purposes. (Doc. 105.) The Court will address this motion by separate order.